UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
BOARD OF EDUCATION OF THE UNIONDALE
UNION FREE SCHOOL DISTRICT,

                          Plaintiff,

              -against-                                  **18-CV-1038(JMA)(AYS)**

J.P. and S.R., individually, and as parents and legal
Guardians of S.P. a minor

                              Defendants.
-----------------------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS ...............................................................................................1

ARGUMENT ..................................................................................................................10

    I: STANDARD OF REVIEW: THE COURT SHOULD DEFER TO THE SRO'S
    DETERMINATION THAT THE DISTRICT DENIED S.P. A FAPE ....................................3

    II: THE DISTRICT FAILED TO OFFER S.P. A FAPE FOR 2016-2017 ..............................8

        A.  The District Predetermined Its Program and Failed to Treat S.P.'s Parents as Full and
            Equal CSE Members ..................................................................................9

        B.  The District Failed to Consider Sufficient Evaluative Material at S.P.'s IEP Meeting
            ..........................................................................................................11

        C.  The District Failed to Develop Appropriate Goals for S.P. .........................................12

        D.  The District Failed to Recommend Sufficient Related Services for S.P. ....................13

        E.  S.P. Failed to Progress with General Education and Resource Room.........................14

    III: THE SRO PROPERLY DETERMINED THE DISTRICT DENIED S.P. A FAPE BY
    FAILING TO ADDRESS HER READING NEEDS IN THE IEP. ......................................17

    IV: S.P.'S UNILATERAL PROGRAM AT S.P. WAS APPROPRIATE..............................20

    V: EQUITIES FAVOR S.P. AND HER PARENTS. ..........................................................23


CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*A.C. v. Chappaqua Cent. Sch. Dist.*,
    553 F.3d 165 (2d Cir. 2009).................................................................4

*A.R. v. N.Y. City Dep't of Educ.*,
    12 Civ. 4493 (PAC), 2013 WL 5312537 (S.D.N.Y. Sept. 23, 2013) ...............................24

*B.K. v. N.Y. City Dep't of Educ.*,
    12 F. Supp. 3d 343 (E.D.N.Y. 2014) ...........................................................4, 20

*Bd. of Educ. v. Rowley*,
    458 U.S. 176 (1982)..............................................................................9, 15

*Bd of Educ. of the Mamaroneck UFSD v. A.D.*,
    16-CV-2025, 2017 WL4466613 (S.D.N.Y. Oct. 5, 2017) ................................18

*C.F. v. N.Y. City Dep't of Educ.*,
    746 F.3d 68 (2d Cir. 2014).....................................................................9, 18

*C.L. v. Scarsdale Union Free Sch. Dist.*,
    744 F.3d 826 (2d Cir. 2014)...................................................................23

*Cerra v. Pawling Cent. Sch. Dist.*,
    427 F.3d 186 (2d Cir. 2005) ....................................................................4

*Connors v. Mills*,
    34 F. Supp. 2d 795 N.D.N.Y. 1998) .............................................................9

*Deal v. Hamilton Cty. Bd. of Educ.*,
    392 F.3d 840 (6th Cir. 2004) ...................................................................10

*Endrew F. v. Douglas Cty Sch. Dist.*,
    137 S. Ct. 988 (2017) ....................................................................9, 12, 15

*F.O. v. N.Y. City Dep't of Educ.*,
    976 F. Supp. 2d 499 (S.D.N.Y. 2013)...........................................................7

*Florence Cnty. Sch. Dist. Four v. Carter*,
    510 U.S. 7, 12 (1993).............................................................................9

*Frank G. v. Bd. of Educ. of Hyde Park*,
    459 F.3d 356 (2d Cir. 2006) ...................................................................20

*Gagliardo v. Arlington Cent. Sch. Dist.*,
   489 F.3d 105 (2d Cir. 2007)....................................................................................13, 20, 22

*H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*,
   528 Fed. App'x 64 (2d Cir. 2013) .................................................................................16

*Honig v. Doe*,
   484 U.S. 305 (1988).......................................................................................................7

*L.O. v. N.Y. City Dep't of Educ.*,
   822 F.3d 95 (2d Cir 2017) ..............................................................................11, 13, 18

*Lillbask v. Conn. Dep't of Educ.*,
   397 F.3d 77 (2d Cir. 2005).............................................................................................3

*M.H. v. N.Y. City Dep't of Educ.*,
   685 F. 3d 217 (2d Cir. 2012).....................................................................................4, 10

*Matrejek v. Brewster Cent. Sch. Dist.*,
   471 F. Supp. 2d 415, (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) ...............20

*Mrs. B. v. Milford Bd. of Educ.*,
   103 F.3d 1114 (2d Cir. 1997)..........................................................................................9

*Murphy v. Arlington Cent. Sch Dist.*,
   297 F.3d 195 (2d Cir 2002)............................................................................................7

*P. v. Newington Bd. of Ed.*,
   546 F.3d 111 (2d Cir. 2008) ........................................................................................23

*P.F. v. Bd. of Educ. of the Bedford Cent. Sch. Dist.*,
   15-cv-507 (KBF), 2016 WL 1181712, (S.D.N.Y. Mar. 25, 2016) .............................10, 12

*P.K. v. N.Y. City Dep't of Educ.*,
   819 F.Supp.2d 90 (E.D.N.Y. 2011) ..............................................................................24

*R.E. v. N.Y. City Dep't of Educ.*,
   694 F.3d 167 (2d Cir. 2012)..............................................................................4, 7, 8, 18

*Reyes v. N.Y. City Dep't of Educ.*,
   760 F.3d 211 (2d Cir 2014)...........................................................................................18

*Sch. Comm. of Burlington v. Dep't of Educ.*,
   471 U.S. 359 (1985) .......................................................................................................9

*V.S. v. N.Y. City Dep't. of Educ.*,
   25 F.Supp.3d 295 (E.D.N.Y. 2014) ..............................................................................18

*Walczak v. Fla. Union Free Sch. Dist.*,
      142 F.3d 119 (2d Cir. 1998)................................................................3, 17

## STATUTES AND REGULATIONS

20 U.S.C. § 1400(d). .....................................................................................8

20 U.S.C. §1401(9) ......................................................................................13

20 U.S.C. § 1412(a)(10)(C) .......................................................................9, 24

20 U.S.C. § 1414(d) .....................................................................................18

20 U.S.C. § 1414(c)(1)(A) ...........................................................................11

20 U.S.C. § 1414(d)(1)(A) .........................................................................7, 12

20 U.S.C. § 1415(f)(3)(E)(ii) ........................................................................11

20 U.S.C. § 1415(i)(2)(C) ..............................................................................3

34 C.F.R. § 300.39(b)(3)................................................................................5

8 N.Y.C.R.R. §200.1(kk) ..............................................................................14

N.Y. Educ. L. § 4404(1)(c).............................................................................9

## ADMINISTRATIVE GUIDANCE

*Guidelines on Implementation of Specially Designed Reading Instruction to Students with Disabilities and Clarification About 'Lack of Instruction' in Determining Eligibility for Special Education*, VESID Mem. May 1999. available at
http://www.p12.nysed.gov/specialed/publications/policy/readguideline.html ...............................6

*Letter to Chambers*, 59 IDELR 170 (OSEP 2012) ......................................19

## PRELIMINARY STATEMENT

J.P. and S.R., individually and on behalf of their minor daughter S.P., hereby oppose the Motion of Summary Judgment of the Plaintiff Uniondale Union Free School District ("District") dated October 19, 2018, and cross-move for summary judgment. Defendants respectfully submit that the decision of the State Review Officer ("SRO") dated November 29, 2017 should be affirmed insofar as it held that Plaintiff failed to offer S.P. a free appropriate public education ("FAPE") and awarded full tuition ($46,750.00) for S.P.'s private school placement at the Vincent Smith School for the 2016-2017 school year.

## STATEMENT OF FACTS

Defendants respectfully refer the Court to their Rule 56.1 Statement of Material Facts dated November 26, 2018, for the relevant material facts upon which they base their motion for summary judgment.  A brief recitation of material facts follows.

S.P. was 12 years old during the 2016-2017 school year. She was diagnosed with dyslexia, attention deficit hyperactivity disorder ("ADHD"), autism spectrum disorder, language disorder, and specific learning disorders. (Exs. F, W).[1] The District classified her as having a Speech or Language Impairment. (Ex. 3).

For the 2016-2017 school year, the District's IEP for S.P. recommended placement in a sixth grade general education class, resource room once per day for 43 minutes in a group of five students, and speech/language therapy twice per week for 30 minutes in a group of five students. (Ex. 3). At the time of the IEP meeting, S.P. was performing many years below grade level according to District and private testing, and she particularly struggled with reading. (T. 380-81;

---

[1] Citations refer to exhibits entered into evidence at S.P.'s impartial due process hearing and are part of the certified administrative record. Parent exhibits are identified as "Ex. [letter-page number]" and the District's exhibits are identified as "Ex.  [number-page number]." References to the transcript of the impartial due process hearing are identified as "T. [page]."

Exs. F, 7, 8, 14, 17, 24, 32). Though she was heading into sixth grade, and was chronologically a seventh grader, <u>S.P. could not read</u>. (T. 380, 1367). She also struggled with language skills and social/emotional development. (T. 239, 270, 1522 1599-1600, 1615; Exs. F-4, 14).

S.P. had attended general education in the District since her kindergarten year. (T. 1716). She was left back and repeated kindergarten. (T. 115, 651, 914).  In second grade she began receiving one period per day of resource room in a group and speech therapy in a group in accordance with IEPs which the District developed. (T. 1717-19; Exs. 5, 6). The District never placed S.P. in a special education classroom. (T. 48, 1722-23).

District evaluations and progress reports consistently showed that S.P.'s performance stagnated. (Exs. 8, 9, 13, 17, 19, 24, 26, 32). For example, though the District continued to pass S.P. from grade to grade, her reading remained at second grade level for three years. (T. 649-50; Ex. 7). Likewise, S.P. had not achieved a single IEP Goal from the previous three years. (Exs. H, X, Y). S.P. was identified as a "struggling student" whose distractibility impacted her academics. (T. 735, 749). Her language skills were "well below age level expectancy, suggesting that her language skills are severely reduced." (Ex. 14-2).

Despite S.P.'s ongoing delays and struggles, the District failed to offer her more intensive special education supports for the 2016-2017 school year. In fact, the District reduced S.P.'s services by offering shorter resource room sessions and one less session of weekly speech therapy. (*Compare* Ex. 3 with Ex. 5). S.P.'s parents supplied the District with an evaluation and letters from a developmental pediatrician which recommended a special education class and specific supports to address S.P.'s profound reading deficits. (Exs. D, E, F; T. 1738, 1740, 1775). The District did not consider those recommendations. (T. 51, 64-65).

S.P.'s parents disagreed with the District's IEP recommendations and provided timely written notice of their intention to place S.P. in a private school, the Vincent Smith School ("VSS"). (Ex. R). The District did not respond to S.P.'s parents' letter. (T. 1757).

S.P. began VSS in September 2016. (T. 1036, 1045). She was in a class of four students, led by a teacher certified in general and special education. (T. 1046, 1115, 1481). S.P. received specialized reading instruction with a teacher certified in Wilson reading. (T. 1351-52). She also received both speech therapy and counseling, individually and in a group. (T. 1144, 1152, 1587, 1625, 1627). S.P. received extra support and modifications for her individual needs. (T. 1486, 1493, 1495, 1504-05). S.P. progressed meaningfully in all domains. (Ex. EE; T. 1271, 1516-17).

Following an impartial due process hearing, an Impartial Hearing Officer ("IHO") found that the District offered S.P. a FAPE, but that VSS was appropriate, and that equities favored S.P. and her parents. (IHO Decision, pp. 49-51). On appeal, the SRO reversed the IHO's erroneous determination and found that the District failed to offer S.P. a FAPE for the 2016-2017 school year. (SRO Decision, p. 38). The SRO agreed that VSS was appropriate and that equities supported a full award of tuition. (*Id.*). The District appealed to this Court.

## ARGUMENT

### I. STANDARD OF REVIEW: THE COURT SHOULD DEFER TO THE SRO'S DETERMINATION THAT THE DISTRICT DENIED S.P. A FAPE

Federal courts decide IDEA actions based on a preponderance of the evidence developed at the administrative proceedings and any other evidence presented. 20 U.S.C. § 1415(i)(2)(C); *Walczak v. Fl. Union Free Sch. Dist.,* 142 F.3d 119, 122-123 (2d Cir. 1998). When parties file for summary judgment in an IDEA case, courts consider the motion "in substance an appeal from an administrative determination, not summary judgment." *Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 (2d Cir. 2005). Courts must give "due weight" to the administrative proceedings,

3

"mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of education policy." *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012).  The Second Circuit has cautioned that the IDEA requires "substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005).

Where an IHO and SRO reach conflicting conclusions, courts "defer to the final decision of the state authorities, that is, the SRO's decision." *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). The decision of an IHO "may be afforded diminished weight" where it conflicts with a subsequent determination of the SRO, as courts have a general policy of "defer[ring] to the final decision of the state authorities." *A.C. v. Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). Deference to final administrative decisions "is particularly apt where the IHO and SRO decisions are in agreement." *B.K. v. N. Y. City Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014). The burden of demonstrating that an SRO ruled incorrectly falls on the party challenging that decision. *M.H.*, 685 F.3d at 255, n.3.

Here, the IHO and SRO reached differing conclusions as to whether the District offered S.P. a FAPE for the 2016-2017 school year. The SRO reversed the IHO's determination and properly concluded that the District failed to offer S.P. a FAPE. (SRO Decision, p. 38). The crux of the SRO's finding of FAPE denial rested on the District's failure to offer S.P. specialized reading instruction in its IEP for her. (*Id.* at 29). The SRO's determination is supported by the hearing record which established that S.P. presented with serious deficits in reading and required IEP services to remediate that deficit.

The SRO noted that despite awareness of S.P.'s reading difficulties, the CSE "did not recommend, nor did the IEP provide, specialized reading instruction." (*Id.* at 26). The SRO

acknowledged that the IEP included a recommendation for resource room but concluded that "despite the student's significant weaknesses in reading and memory, the February 2016 IEP did not indicate that resource room services would be dedicated to reading instruction." (*Id.* at 27). The SRO discussed testimony that S.P. had received Academic Intervention Services ("AIS"), i.e., supplementary instruction to assist students with and without disabilities who are struggling to meet state education standards, but that the District "did not include a recommendation for AIS in reading or another service specific to reading instruction on the February 2016 IEP." (*Id.*).

In reaching the conclusion that the District denied S.P. a FAPE, the SRO considered evidence and testimony in the record, as well as applicable law and educational guidance. The SRO discussed guidance by the United States Education Department ("USED") which requires that services falling into the realm of special education be listed on an IEP. (*Id.* at 27-28)

The SRO determined that the District's own description of AIS services "appears to align with the guidance from the [USED] because it meets the definition of 'specially designed instruction.'" (*Id.* at 28 *citing* 34 C.F.R. § 300.39(b)(3)). Specially designed instruction is defined in part, as adapting the content, methodology, or delivery of instruction to address the unique needs of a student with a disability that result from the student's disability. (*Id.*). The District's AIS teacher testified that AIS consisted of instruction that was tailored or differentiated to the needs of a particular student. (T. 577-78). The SRO found that the hearing record reflected that the AIS teacher modified the content and delivery of instruction to address S.P.'s unique needs in reading, such that it constituted specially designed instruction and was required to be included in S.P.'s IEP. (SRO Decision, p. 28).

The SRO also explained a New York State Education Department ("NYSED") policy. (*Id.* at 26). The NYSED policy provides that although the *term* "specialized reading instruction"

need not appear in an IEP, the method for providing that instruction must. Specifically, the guidance states "[t]he IEP describes how specially designed reading instruction will be provided, although the term 'specially designed reading instruction' need not appear on the IEP." *Guidelines on Implementation of Specially Designed Reading Instruction to Students with Disabilities and Clarification About 'Lack of Instruction' in Determining Eligibility for Special Education*, VESID Mem. May 1999. NYSED lists examples, noting that specially designed reading instruction may be provided through consultant teacher services, a resource room program, a special class, or related services.

Here, it is undisputed that the District failed to recommend any specialized reading instruction or reading support services in its IEP for S.P. The District completely failed to identify in its IEP *how* S.P.'s specialized reading needs would be met. As noted, the SRO found that the District failed to show that resource room services would be dedicated to reading instruction. (SRO Decision, p. 27).

The SRO's determination is grounded in educational policy as it pertains to specialized reading support that S.P. needed in her IEP. Contrary to the Plaintiff's claims, the SRO did not "clearly struggle[] with an issue of law." (Plaintiff's Memorandum of Law ("Pl. Memo"), p. 6). The SRO described USED and NYSED guidance policies and did not struggle to explain their import or apply the policies to S.P.'s case. Plaintiff also suggests that the USED and NYSED policies are "conflicting." (Pl. Memo, p. 7). The SRO never stated that the policies were conflicting, and the SRO's analysis demonstrates that the policies peacefully co-exist. The USED policy requires specially designed instruction to be listed in an IEP, and NYSED policy requires that the IEP include the method of how specially designed reading instruction will be provided.

In considering the hearing record, the SRO properly found that the District failed to meet S.P.'s reading needs. Failure to include supports which a student needs to address an area of deficit on an IEP is a significant substantive failure. After all, the IEP is "[t]he 'centerpiece' of the IDEA's education delivery system." *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195, 197 (2d Cir. 2002) (*quoting Honig v. Doe*, 484 U.S. 305, 311 (1988)). It "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the *specially designed instruction* and services that will enable the child to meet those objectives." *Honig*, 484 U.S. at 311 (emphasis added); *see also* 20 U.S.C. § 1414(d)(1)(A). Plaintiff complains that the SRO "erred in ignoring evidence" about reading services which the District claimed it would have provided to S.P. for the 2016-2017 school year. (Pl. Memo, p. 7). On the contrary, the SRO was correct to disregard retrospective evidence. "While an IHO or SRO may rely on testimony describing a service listed in the IEP or its methodology, it may not rely on testimony regarding additional services absent from the IEP." *F.O. v. N.Y. City Dep't of Educ.,* 976 F. Supp. 2d 499, 517 (S.D.N.Y. 2013); *see also R.E.,* 694 F.3d at 186 ("[T]he IEP must be evaluated prospectively as of the time of its drafting and therefore ... retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered.")

Plaintiff urges this Court to reverse this determination and reinstate the IHO's Decision. (Pl. Memo, p. 6). Plaintiff has not sustained its burden of showing that the SRO ruled incorrectly or that the SRO's decision is insufficiently reasoned. <u>Significantly, the IHO did not address the impact of District's failure to include specialized reading instruction in S.P.'s IEP.</u> (*See generally* IHO Decision). While an SRO's decision may be disregarded for a more thoroughly reasoned

IHO decision, here there is no IHO reasoning on this point to consider. This Court should not disregard the SRO's determination, especially as the IHO did not address this issue.

Further, the District offers no reasoning why it should be excused from its failure to offer S.P. an IEP which included specially designed instruction to address her documented weaknesses in reading and dyslexia, and failed to proffer a reason for ignoring USED guidance on that issue.

The SRO devoted three pages of the Decision to analyzing the District's failure to offer S.P. specialized reading support in the IEP. (SRO Decision, pp.26-29). The SRO carefully analyzed the issue and ultimately decided that the "district denied the student a FAPE for its failure to address the student's reading needs during the 2016-17 school year." (*Id.* at 29).

Courts rarely, if ever, reverse an SRO's decision which found FAPE *denial* and awarded private school tuition. Second Circuit and New York case law demonstrate that courts are especially deferential when the SRO finds that the District denied a student a FAPE, and courts have not stepped in and substituted their own judgment to find a FAPE was offered. Plaintiff here is requesting that this Court disregard well-established precedent that an SRO's findings of FAPE denial deserve substantial deference.

## II. THE DISTRICT FAILED TO OFFER S.P. A FAPE FOR 2016-2017

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d). School districts "must produce, in writing, an [IEP] that 'describes the specially designed instruction and services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child." *R.E.*, 694 F.3d at 175 (*citing* 20 U.S.C. § 1414(d)).

A parent who believes that his or her disabled child has been denied a FAPE under the IDEA may unilaterally place that child in a private school and then seek reimbursement from the

school district. 20 U.S.C. § 1412(a)(10)(C)(ii); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) ("Burlington"); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12 (1993)("Carter"). To determine whether a parent is entitled to reimbursement/direct payment, a court applies the three-prong *Burlington/Carter* test, "which looks to (1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. v. N.Y. City Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). Once the *Burlington/Carter* test is met under the IDEA, and a parent shows that his or her financial circumstances eliminate the opportunity for the unilateral placement, the school district must pay the cost of the private placement and services immediately. *See Connors v. Mills*, 34 F. Supp. 2d 795, 803-804 (N.D.N.Y. 1998).

Under New York State law, the school district bears the burden of proof, "including the burden of persuasion and burden of production," to establish that its proposed IEP provided a FAPE. N.Y. Educ. L. § 4404(1)(c). In order to offer a FAPE, the District must comply with the IDEA's procedural requirements, and develop an IEP that is reasonably calculated to enable a student to benefit educationally. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-207 (1982). An IEP must afford the opportunity to make greater than "trivial advancement." *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1121 (2d Cir. 1997). A recommended program must be "appropriately ambitious," and providing merely more than *de minimis* benefit is not enough. *Endrew F. v. Douglas Cty Sch. Dist.,* 137 S. Ct. 988, 992 (2017).

### A.  The District Predetermined Its Program and Failed to Treat S.P.'s Parents as Full and Equal CSE Members

The District committed a procedural violation of the IDEA by failing to consider S.P.'s parents' concerns and requests for S.P.'s program, effectively shutting them out of the IEP

9

development process. While the IHO and SRO both concluded that S.P.'s parents were not denied meaningful participation, the hearing record as a whole compels a contrary conclusion. Less administrative deference is warranted in appeals involving an IEP's procedural validity. *M.H.*, 685 F.3d at 244. The District urges this Court to rubberstamp the administrative decision without reviewing the hearing record.

The hearing record establishes that S.P.'s mother often voiced complaints and asked the District to consider more intensive special education supports for S.P. than the general education class with resource room that the District continued to offer. (T. 1716-19, 1722-23). S.R. provided documentation from S.P.'s doctor, who recommended a smaller self-contained special education program and reading services. (Exs. D, E. F; T. 1738-40). The District repeatedly rebuffed Defendants' requests. The District's Prior Written Notice conclusively establishes that the CSE did not consider any other program options for S.P. on the continuum of services. (Ex. 4; *see also* T. 504). The CSE Chairperson testified that the CSE Team did not consider private evaluative information at the meeting. (T. 51, 64-65).

Although S.R. was present at the CSE meeting and had an opportunity to speak, that alone does not equate to meaningful participation. *See Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004)(reasoning that an IEP can still be predetermined even when the parents are afforded the opportunity to speak at the CSE meeting if the district failed to involve the parents adequately in a collaborative process and consistently rejected parent requests).

In *P.F. v Bd. of Educ. of the Bedford Cent. Sch. Dist.*, the court, in reversing an SRO's finding that a parent meaningfully participated in an IEP meeting, noted that the CSE failed to consider private doctor's reports and failed to meaningfully respond to parental concerns. 15-cv-507 (KBF), 2016 WL 1181712, at *7 (S.D.N.Y. Mar. 25, 2016). Although the parents *attempted*

10

to participate, the district's lack of consideration for the parents constituted predetermination, and a procedural violation of the student's right to receive a FAPE. *Id.* Here similarly, S.P.'s parents' participation was "mere form" and not meaningful. This is a serious procedural violation which constituted a FAPE denial as it significantly impeded on S.P.'s parents' right to participation. 20 U.S.C. § 1415(f)(3)(E)(ii).

**B.  The District Failed to Consider Sufficient Evaluative Material at S.P.'s IEP Meeting**

Indisputably the District failed to review sufficient evaluative material at S.P.'s CSE meeting, in violation of the IDEA's mandate that a CSE review "existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers." 20 U.S.C. § 1414(c)(1)(A).

The IHO and SRO both found that the CSE had sufficient evaluative information. However, the administrative officers overlooked the CSE Chairperson's testimony that the CSE limited its review to one evaluation, an October 23, 2013 Psychological evaluation. (T. 64-65; Ex. 17). He denied relying on a classroom observation at the CSE meeting. (T. 65). He testified that the team did not rely on Dr. Alyson Gutman's (S.P.'s private neuropsychologist) evaluation or recommendation letters. (T. 51, 100; Exs. D, E, F).  In the decision, the SRO wrote that the CSE relied on six different evaluations. (SRO Decision, p. 12) This finding is not supported by the CSE Chairperson's testimony. Although the IEP may have referenced other evaluative materials, the Second Circuit explained that the IDEA requires that a "CSE *actually review* evaluative data and base the terms of the student's IEP on that information." *L.O. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 110 (2d Cir 2017)(emphasis added).

The District lacked sufficient evaluative information and as a result failed to accurately identify S.P.'s areas of need. In particular, the District failed to acknowledge that S.P. was

diagnosed with dyslexia and failed to offer her supports to address this. (T. 141). The District's failure to offer S.P. specialized reading supports, found to cause a denial of FAPE, was borne out of its refusal to consider all relevant evaluations and ascertain S.P.'s actual needs.

### C. The District Failed To Develop Appropriate Goals for S.P.

The hearing record establishes that S.P. perpetually struggled to achieve the District's IEP Goals for her. A review of progress reports for the three school years prior to 2016-2017 shows that S.P. never achieved any of her IEP Goals. (Exs. H, X, Y). The District was doing something wrong in developing Goals for S.P. when for three years she never met one IEP Goal.

The IDEA mandates that an IEP include annual Goals designed to "enable the child to ... make progress" and "meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i). S.P. was making "less than anticipated progress" for many Goals. (Exs. H, X, Y). For the 2016-2017 school year, instead of offering S.P. appropriate supports, the District terminated or lowered mastery criteria for Goals for which S.P. was not progressing. (T. 130, 146, 524). The District eliminated S.P.'s opportunity "to meet challenging objectives." *Endrew F.*, 137 S.Ct. at 1000.

The District also added Goals to S.P.'s IEP which aligned with sixth grade curriculum instead of S.P.'s individual needs. (T. 1524-26). The District also failed to include Goals targeting S.P.'s documented areas of deficit including following multi-step directions, answering WH- questions, decoding, word suffixes, and cause and effect. (T. 132, 316, 516-17, 519). In *P.F.* the Court reversed an SRO's determination, and found that an IEP was not reasonably calculated to ensure educational benefit where the record lacked evidence that annual Goals "would *meet* the student's specific needs." 2016 WL 1181712, at *9 (emphasis in original).

Here the SRO found the District's annual Goals met S.P.'s identified needs; however, that finding rests on the flawed presumption that the CSE Team accurately identified S.P.'s

needs. (SRO Decision, p. 17). As noted, *supra*, the District failed to consider sufficient evaluative material and failed to identify S.P.'s key deficit areas. Accordingly, the District's Goals were generic and not designed to address specific and unique S.P.'s needs.

### D. The District Failed to Recommended Sufficient Related Services for S.P.

The IDEA mandates that in order to provide a FAPE, a school district must provide, *inter alia*, related services tailored to meet a student's unique needs. 20 U.S.C. § 1401(9); *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007). Here, the District recommended just two 30 minute sessions per week of speech therapy in a group of five students, and no other related services, for S.P. (Ex. 3). The hearing record, including a District speech and language evaluation, establishes that S.P. presented with serious speech delays that affected her academic instruction. (T. 239, 758; Ex. 20). The District even classified S.P. as having a Speech or Language Impairment and identified her speech delays as a chief concern. (T. 54-55).

Nevertheless, for 2016-2017 the District reduced its speech therapy mandate from three weekly sessions to just two and failed to offer S.P. any individualized speech therapy. (Exs. 3, 5). The record establishes that this failure to provide appropriate and sufficient services resulted in a FAPE denial particularly because S.P.'s performance in speech, even with three weekly sessions, was inconsistent and mostly poor. (T. 261, 270, 315, 758). S.P. was regressing according to her speech therapist, and she had not met any speech Goals. (T. 270, 315; Ex. H). *See L.O.*, 822 F.3d at 116 (concluding that 2x30 minutes per week of group speech was "not adequately designed to address and improve [the student's] speech-language needs."). The District's decision to reduce S.P.'s speech mandate was based on what it could accommodate in its middle school rather than S.P.'s individual needs. (T. 90-91, 279). Further, the District's failure to consider individual speech therapy for S.P. was based on administrative policies. The District offered 1:1 services primarily for younger students or "somebody who is on the autistic spectrum." (T. 326).

13

The District failed to recommend counseling services for S.P. though she presented with social and emotional issues which impacted her academics and classroom performance. (Ex. F; T. 75-76, 87, 1522). S.P. was withdrawn and isolated, and she suffered from poor self-esteem. (T. 1615, 1599-1600).  She internalized her distress and could not deal with conflict adequately. (T. 1598-1600). In 2013, S.P.'s teachers identified that S.P. had symptoms of inattention and anxiety and reported "[S.P.] often has little self confidence or is very self-conscious." (Ex. F). The District did not even consider counseling for S.P. (T. 75-76).

Finally, the District failed to recommend parent training and counseling for Defendants, for the sole reason that S.P. was not classified as having Autism. (T.100). The District's automatic refusal to even consider parent counseling and training again illustrates that the District was operating based on administrative policies instead of considering S.P.'s individual needs. The record establishes that S.P.'s parents needed assistance to understand S.P.'s disability and provide follow-up interventions at home, especially to help S.P. with homework. *See* 8 N.Y.C.R.R. §200.1(kk). S.P.'s mother testified that she had enlisted the help of private tutors over the years to help S.P., and she continued to need assistance to help S.P. (T. 1750-51).

In determining that the related service recommendations were appropriate, the administrative officers overlooked and failed to grapple with evidence in the hearing record which detailed S.P.'s need for greater related service supports. The administrative officers also overlooked the District's improper reasoning for failing to consider additional services for S.P. The Court should reverse these determinations, as the record as a whole shows that S.P. required more related services to meet her educational needs.

### E.  S.P. Failed to Progress with General Education and Resource Room

The District argues that S.P. progressed in prior years within the District's general education classroom and just one period of resource room. (Pl. Memo, pp. 11-12). The District's

arguments are betrayed by the hearing record as a whole. S.P.'s performance in the District was marked by stagnation and regression. As a matter of law, she did not achieve the educational benefits mandated by the IDEA.

The IDEA contemplates *grade-level advancement* for children with disabilities who are fully integrated in regular classes (like S.P.), and "trivial" or "de minimus" progress fails to meet that standard. *See Endrew F.*, 137 S. at 999 (referencing *Rowley*). The District had recommended that S.P. attend a general education class for the majority of her school day. (Ex. 3). However, she did not perform on grade level, nor achieve a year's worth of progress each school year.

The evidence and testimony cited to by Plaintiff further highlights how behind S.P.'s performance lagged. For example, Plaintiff cites testimony from S.P.'s fifth grade general education teacher that S.P. "progressed three letter levels" from Level "I" to Level "L" on the Fountas and Pinnel reading scale. (Pl. Memo, p. 12). Plaintiff conveniently omits that Level "L" is commensurate with mid-second grade reading level. (Ex. DD). S.P. was going into sixth grade, but she was four years behind in reading. This is not meaningful progress.

Plaintiff cherry-picks a few random tests scores in an attempt to show that S.P. was progressing, and even goes so far as to claim S.P. was "above average" in math. (Pl. Memo, p. 12). Plaintiff glosses over the lion's share of testimony and evaluations, which illustrate that S.P. was well below average in academics and that she was regressing. For example, District testing from 2011 showed that S.P.'s cognitive function was in the 4th percentile and below age-expectancy. (Ex. 8). Her academic skills in reading and math were below average. (Ex. 9). District testing from 2013 indicated that "[S.P.] is not progressing academically." (Ex. 17). S.P.'s intellectual performance was "below age-appropriate." (*Id.*). An educational evaluation from 2013 showed that S.P.'s academic skills in reading and math remained below average. (Ex.

13). Her weakest areas were identified as "Word Reading, Early Reading Skills, and Math Fluency-Addition." (*Id.*). A 2013 neurodevelopmental evaluation showed that S.P.'s reading was estimated to be at a first/second grade level and her math skills were at second grade level. (Ex. F). Academic testing administered in 2014 and 2015 showed that S.P. performed below first grade level in early reading skills and decoding, and at the first/second grade level for reading comprehension, alphabet writing, word reading, and spelling. (Exs. 24, 26, 32).

In addition to the evaluation results which showed consistently "below average" performance, testimony from S.P.'s teachers corroborated S.P.'s lack of progress. For example, S.P.'s fifth grade general education teacher testified that relative to her classmates, S.P. "was a struggling student." (T. 735, 749). S.P. was ranked "toward the bottom," of his 27 student class, the large majority of whom performed below grade level in reading. (T. 829, 750). S.P.'s resource room teacher confirmed that S.P. had regressed and did not achieve any Goals at the conclusion of 2015-2016. (T. 494-95; *see* Ex. H). The resource room teacher also confirmed that S.P. could not read at the end of her fifth grade year. (T. 380, 383). A few passing marks, which Plaintiff referenced, were outliers in an overall downward trend of academic performance.

Plaintiff does correctly point out that a student's progress under a prior IEP is relevant to determining whether an IEP has been appropriately developed, particularly if the parents express concern with respect to the student's rate of progress. (Pl. Memo, p. 11 *citing H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, 528 Fed. App'x 64, 66-67 (2d Cir. 2013)). Here S.P.'s lack of progress and limited success with similar IEPs shows that the District's 2016-2017 recommendations were inappropriate. As noted, for 2016-2017 the District eliminated one session of speech therapy and reduced the amount of resource room S.P. would receive. While the SRO suggested that S.P. made some progress under prior IEPs, the SRO did not conclude

16

that the 2016-2017 IEP was appropriate on that basis. (SRO Decision, p. 26). In fact, the SRO determined that the 2016-2017 IEP was not sufficient to confer a FAPE for S.P. (*Id.* at 29).

### III.   THE SRO PROPERLY DETERMINED THE DISTRICT DENIED S.P. A FAPE BY FAILING TO ADDRESS HER READING NEEDS IN THE IEP

As indicated *supra,* the District committed various procedural and substantive violations which denied S.P. a FAPE. The SRO correctly found that the District denied S.P. a FAPE for its failure to address S.P.'s reading needs during the 2016-2017 school year. (SRO Decision, p. 29).

Plaintiff argues that the SRO incorrectly found the 2016-2017 IEP substantively inadequate. (Pl. Memo, p. 14). As argued above, the SRO's reasoning on this point was sound and is owed a substantial degree of deference. Plaintiff is incorrect in its assertion that the SRO decided this issue "sua sponte" and without S.P.'s parents raising the issue. (*Id.*). In their hearing request, S.P.'s parents raised the issue that the "District failed to offer [S.P.] any intensive reading instruction though her reading skills were several grades below grade level." (Ex. A-5). They also claimed that the District failed to note that S.P. is diagnosed with dyslexia and that she requires individual services and supports to address that disability. (*Id.* at 3).

In Plaintiff's estimation, the hearing record reflects that S.P. made "some degree of progress" during previous school years with similar IEPs; Plaintiff argues that this should mean her 2016-2017 IEP is automatically appropriate. First, the hearing record does not reflect, and the SRO did not specifically find, that the "progress" S.P. made was anything more than di minimus benefit or mere trivial advancement. *See Walczak*, 142 F.3d at 130 (an IEP must afford a student with "an opportunity greater than mere trivial advancement.").

Second, while, as noted, progress under a prior IEP is relevant, it is not dispositive to a finding of FAPE. To satisfy the IDEA's requirements the District must show that the IEP offers "specially designed instruction and services that will enable the child to meet stated educational

17

objectives and is reasonably calculated to give educational benefits to the child." *R.E.*, 694 F.3d at 175(*citing* 20 U.S.C. § 1414(d)). Here the District's IEP lacks specially designed instruction to meet S.P.'s identified educational needs, specifically in reading. The failure to include a critical support service for a student who requires it is a serious substantive violation which results in a FAPE denial, as the SRO correctly found.

Plaintiff undermines the importance of the requirement of including services in an IEP. Plaintiff argues against the SRO's finding that the IEP was inadequate "simply because the SRO found that AIS reading services are not expressly noted and recommended on the February 2016 IEP." (Pl. Memo, p. 15). In *R.E.*, the Second Circuit held that "[r]etrospective evidence that materially alters the IEP is not permissible." 694 F.3d at 188. Since that pronouncement against retrospective evidence, courts have routinely rejected extrinsic evidence regarding additional services absent from the IEP. *See, e.g.*, *L.O.*, 822 F.3d at 115 (reasoning that neither courts nor administrative officers may rely on evidence about language services *actually* received in public school placement when those recommendations are not included in the IEP); *C.F.*, 746 F.3d at 81 (concluding that testimony about educational methodology not listed in IEP is "improper retrospective testimony"); *Reyes v. N.Y. City Dep't of Educ.*, 760 F.3d 211, 220 (2d Cir. 2014) (holding that testimony that an IEP could have been modified at some point in the future to extend services is impermissible under *R.E.*); *Bd of Educ. of Mamaroneck v. A.D.*, 2017 WL4466613 (S.D.N.Y. 2017) (rejecting "retrospective evidence" that a student *would have* received counseling "[b]ecause the IEP did not recommended formal counseling services"); *V.S. v. N.Y. City Dep't of Educ.*, 25 F.Supp.3d, 295, 300 (E.D.N.Y.  2014) (finding testimony about a school "should have been excluded as retrospective").

Here Plaintiff referenced testimony that S.P. would have received AIS services in its recommended middle school placement and urges this Court to consider and evaluate that testimony. (Pl. Memo, p. 16-17). Even assuming *arguendo* that the record did establish S.P. would receive AIS services in middle school,[2] this evidence <u>must</u> be excluded as it is improperly retrospective and cannot cure the deficiently written IEP which lacks AIS services. Plaintiff offers no explanation why this Court should deviate from the well-established precedent in this Circuit prohibiting retrospective testimony regarding services not included in an IEP.

Plaintiff argues that the SRO's analysis of educational guidance is somehow contradictory. (Pl. Memo, p. 16). Plaintiff simply misinterprets guidance to mean that AIS services may never be included on an IEP. However, as the SRO properly reasoned, citing to *Letter to Chambers* as support, services like AIS which may be part of a district's regular education "does not preclude those services from meeting the definition of 'special education' or 'related services' and being included in the child's IEP." (SRO Decision, p. 28). The United States Department of Education cautioned that while districts may use flexible methods of teaching, "they do not replace the need of a child with a disability for unique, individualized instruction." *Letter to Chambers*, 59 IDELR 170 (OSEP 2012).

Plaintiff also unconvincingly argues that the SRO failed to engage in "required FAPE analysis." (Pl. Memo, p. 16). In fact, the SRO appropriately analyzed and assessed the District's failure. The SRO devoted approximately two pages of the decision to applicable standards of FAPE analysis, including that a core purpose of the IDEA is to offer services designed to meet a child's unique needs and that an IEP must include those services. (SRO Decision pp. 8-9). The

---

[2] At least one District witness testified that she did not believe AIS would be available in the middle school as she did not believe "there's time in the schedule for that." (T. 341).

SRO appropriately applied these standards, finding that the District denied S.P. a FAPE because it failed to offer "specially designed instruction" to meet her reading needs. (*Id.* at 28).

The record amply establishes that S.P.'s reading deficits were significant and that she required specialized reading instruction in her IEP. (Exs. D, E, F; T. 1312, 1767, 1771, 1780). *See Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 427 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008)(finding an IEP appropriate for a student with ADHD and dyslexia appropriate where it offered Wilson reading). The record as a whole supports the SRO's finding of FAPE denial, and this Court should not overturn that decision.

## IV.     S.P.'S UNILATERAL PROGRAM AT VSS WAS APPROPRIATE

Both the IHO and the SRO found that S.P.'s private school program at VSS was reasonably calculated to meet her educational needs. (SRO Decision, p. 30, IHO Decision, p. 49). Deference is particularly appropriate where the IHO and SRO agree. *B.K.*, 12 F. Supp. 3d at 360. Plaintiff offers no reasons to depart from the well-reasoned administrative determinations.

Parents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE and "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a [FAPE]." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). The test of appropriateness is whether the private placement is "likely to produce progress, not regression." *Id.* An appropriate private placement "provides education instruction specifically designed to meet the unique needs of a handicapped child." *Gagliardo*, 489 F.3d at 115. A unilateral placement need not be perfect, need not meet every one of the child's educational needs, and need not be in the child's least restrictive environment ("LRE"). *Frank G.*, 459 F.3d at 364.

VSS is a small special education program for students with disabilities. (Ex. N; T. 1032-

34). During the 2016-2017 school year, S.P. received instruction in the core subject areas of math, English language arts, science, and social studies in a class ratio of four students to one teacher, who was certified in special and general education (T. 1045, 1115, 1481). VSS's curriculum is multi-sensory and based on NY State Learning Standards. (T. 1188). On a weekly basis, VSS also provided S.P. with one individual and two group (2:1) sessions of speech therapy, one individual counseling session and one social skills class, and one individual and two group (2:1) sessions with a teacher certified in Wilson reading. (T. 1198, 1200-01, 1351-52, 1361, 1629; Exs. K, O). Wilson reading, a multi-sensory phonics-based reading program is proven effective for students, like S.P., who are diagnosed with dyslexia and reading disorders. (T. 1312, 1375, 1403, 1409). VSS tailored a program for S.P. based on her needs and interests, providing additional support to her as needed. (T. 1036, 1486, 1514). S.P. progressed meaningfully across several domains during 2016-2017. (Exs. CC, EE; T. 1191, 1271, 1504, 1512-13, 1632-34).

Plaintiff argues that VSS's program was not "specifically designed" to meet S.P.'s needs. (Pl. Memo, pp. 21-22).  Plaintiff's arguments are belied by the hearing record and the SRO's decision. The SRO carefully and thoroughly analyzed the appropriateness of VSS. (SRO Decision, pp. 30-36). The SRO found that VSS offered S.P. specially designed instruction for her specific deficits. The SRO determined that VSS addressed S.P.'s reading by providing daily instruction using SPIRE, an "intervention program for students who have dyslexia or students [who] are struggling to read." (*Id.* at 32). VSS addressed S.P.'s decoding with the Wilson Reading System, a "very structured, repetitive, and very programmatic reading program." (*Id.*)

VSS addressed S.P.'s writing deficits with the "Step Up to Writing program, in conjunction with Harcourt, to improve the student's ability to write complete sentences, develop

a paragraph, and edit her writing." (*Id.*). To address S.P.'s needs in mathematics, VSS used Jump Math, a multi-sensory program based on the fourth grade common core curriculum. (*Id.*). "To address the student's difficulty interpreting the directions to her math homework, the special education teacher testified that she reviewed the math homework with the student at the end of class, and asked the student to underline or circle certain key words in the directions." (*Id.*).

The SRO further found that VSS addressed S.P.'s language needs by providing "speech-language therapy twice per week in a small group (2:1) and once per week individually." (*Id.* at 33). VSS's speech therapist "used therapeutic activities to address [S.P.'s] needs, such as showing her a picture and asking her to complete two-step directions to improve auditory processing and direction-following skills." (*Id.*). VSS also addressed S.P's social emotional needs via counseling services and "Second Step," a social/emotional program, to help students cope with their feelings and to assist in interactions with others. (*Id.*).

Finally, the SRO noted, VSS provided S.P. with additional modifications and accommodations including  "checking for understanding, preferential seating, extended time, directions read, simplified, and repeated, focusing prompts, breaks, visual aids, graphic organizers, wait time for processing, individualized instruction for spelling and reading, and individual time with the classroom teacher for re-teaching." (*Id.* at 34).

The SRO also determined that S.P. progressed, finding that a "[r]eview of [S.P.'s] second term report card showed that the student had improved in reading, language arts, and math." (*Id.*). Plaintiff does not appear to contest that S.P. progressed at VSS, but rather argues that S.P.'s "academic and emotional performance" was "not relevant." (Pl. Memo, p. 20). While a finding of progress is not dispositive in determining whether a unilateral placement is appropriate, it is nevertheless a relevant factor to be considered. *Gagliardo*, 489 F.3d at 115.

Plaintiff incorrectly claims that SRO failed to address the "restrictiveness of [VSS]." (Pl. Memo, p. 22). The SRO did address that claim succinctly under the heading "Least Restrictive Environment." (SRO Decision, p. 36). Plaintiff made similar LRE arguments in its cross-appeal to the SRO as it does here, and the SRO properly dismissed those arguments. (*Id.*). The SRO highlighted that while restrictiveness of a parental placement is a factor to consider, "parents are not as strictly held to the standard of placement in the LRE as are school districts." (*Id. citing C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 830, 836-37 (2d Cir. 2014)).

The preference for mainstreaming must be weighed against the importance of providing an appropriate education. *See P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008). Sometimes education in a regular classroom cannot be achieved satisfactorily. *Id.* S.P. required a more intensive placement to meet her educational needs. VSS offered her an education which met her individual special education needs.

The SRO properly concluded that VSS provided S.P. "with an educational program that met her special education needs and allowed her to make progress, LRE considerations alone do not preclude an award of tuition reimbursement," and there is no reason to overturn that sound judgment. (SRO Decision, p. 36).

## V.    EQUITIES FAVOR S.P. AND HER PARENTS

Both the IHO and the SRO found that equitable considerations weighed in favor of an award of full tuition for S.P.'s parents. (*Id.* at 37; IHO Decision, p. 51).

Plaintiff's argument that S.P.'s parents were not cooperative with the District relies on inaccurate facts and incorrect application of law. First, Plaintiff claims that S.P.'s parents failed to raise their concerns and dissatisfaction until six months after the IEP meeting. (Pl. Memo, p 23). The hearing record shows that S.R. communicated her concerns to the District for years. (T. 40, 43, 1716-19, 1722-23). Even assuming, *arguendo*, that S.P.'s parents did not raise concerns

until sending their notice letter on August 17, 2016, that timely notice letter satisfied their obligation under the IDEA. 20 U.S.C. § 1412(a)(10)(C); *see P.K. v. N.Y. City Dep't of Educ.*, 819 F.Supp.2d 90, 117 (E.D.N.Y. 2011)(courts typically do not deny tuition on grounds of non-cooperation where parents provide the school district with notice). The District can hardly complain that it did not have more advance notice of Defendants' disagreement with the IEP as even upon receiving the written notice, the District took no action to rectify any concerns raised. As S.R. testified, she did not receive a response to her letter. (T. 1757).

Plaintiff also argues that S.P.'s parents "were never interested in obtaining a FAPE." (Pl. Memo, at 24). The District "pretends to have peered into the [parent's] mind and ascertained that she 'never seriously considered sending the Student to a public placement,'" a practice which courts have admonished against. *See A.R. v. N.Y. City Dep't of Educ.*, 2013 WL 5312537, at *9 (S.D.N.Y. Sept. 23, 2013).  This argument fails. First, the record establishes that S.P.'s parents did not begin to consider private school placements until after the February 2016 meeting where the District recommended an inappropriate IEP. (1743-44, 1887). S.P.'s parents have been open-minded to public school and had enrolled S.P. in the District from kindergarten through fifth grade. S.R. testified credibly that for years she had asked the District for help and requested more services and self-contained programming for S.P., but the District always refused. (T. 1875, 1880-81, 1900-01). A "parent's refusal to send the student to the proposed placement does not demonstrate lack of cooperation or support denial of payment..." *P.K.*, 819 F. Supp 2d 118.

Though S.P.'s parents signed a tuition contract with VSS, "[c]ourts have routinely held that where parents signed a private school contract which includes a provision allowing for withdrawal, equities do not bar reimbursement." *Id.*  Even if parents enroll their child in private school *before* rejecting a public school placement, those actions are not so unreasonable to

warrant denial of reimbursement. *Id.* VSS's contract allowed S.P.'s parents to withdraw from the contract and receive a refund if they accepted a District recommendation. (Ex. P-1).

The SRO properly found that "the IHO's determination that equitable considerations weighed in favor of an award of reimbursement to the parents for the costs of the student's tuition at Vincent Smith for the 2016-17 school year is supported by the hearing record and shall not be disturbed." (SRO Decision, p. 37). The Plaintiff failed to demonstrate that this finding should be overturned.

## CONCLUSION

Based on the reasons set forth herein, in conjunction with the other pleadings and entire administrative record, Defendants respectfully request this Court (i) grant Defendants' Cross-Motion for Summary Judgment, (ii) deny Plaintiff's Motion for Summary Judgment, (iii) dismiss Plaintiff's Complaint in its entirety, (iv) award Defendants full tuition ($46,750.00) for S.P.'s program and placement at VSS for the 2016-2017 school year, (v) declare Defendants the "prevailing party," (vi) grant Defendants leave to file a motion for reasonable attorney's fees  in accordance with the IDEA's fee-shifting provision, and  (vii) grant any such other and further relief as the Court deems just and proper.

Dated: New York, New York
          November 26, 2018

s/   Christina D. Thivierge
Christina D. Thivierge (CT9565)
Thivierge & Rothberg, P.C.
Attorneys for Defendants
5 Hanover Square, Suite 1201
New York, New York 10004
          &
200 Willis Avenue
Mineola, New York 11501
Tel: (212) 397-6360/Fax: (212) 397-6361
christina@trspecialedlaw.com
